IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                               :
EUSA-ALLIED ACQUISITION CORP., :
                               :
                 Plaintiff,    :        Civil Action
                               :        No. 11-3181 (JBS-AMD)
           v.                  :
                               :
TEAMSTERS PENSION TRUST FUND   :            OPINION
OF PHILADELPHIA & VICINITY,    :
and LOCAL UNION 312            :
INTERNATIONAL BROTHERHOOD OF   :
TEAMSTERS,                     :
                               :
                 Defendants.   :
                               :
```

APPEARANCES:

James P. Anelli, Esq.
Joseph P. Paranac, Esq.
Robert M. Pettigrew, Esq.
LECLAIRRYAN
One Riverfront Boulevard
16th Floor
Newark, NJ 07102
        Counsel for Plaintiff

Jo Bennett, Esq.
Frank C. Sabatino, Esq.
STEPHENS & LEE
1818 Market Street
29th Floor
Philadelphia, PA 19103
        Counsel for Defendant Teamsters Pension Trust Fund of
        Philadelphia & Vicinity

Susan A. Murray, Esq.
FREEDMAN & LORRY, PC
1601 Market Street
2nd Floor
Philadelphia, PA 19103
        Counsel for Defendant Local Union 312, International
        Brotherhood of Teamsters

**SIMANDLE,** District Judge:

## I.   INTRODUCTION

This matter is before the Court on Plaintiff EUSA-Allied Acquisition Corp.'s motion for a preliminary injunction.  [Docket Item 40.]  Plaintiff seeks entry of a stay of interim payments and arbitration being sought by Defendant Teamsters Pension Trust Fund of Philadelphia and Vicinity (hereafter the "Fund") under the Multi-employer Pension Plan Amendments Act (MPPAA) at 29 U.S.C. §§ 1381-1453.  This motion comes after the Court denied Plaintiff's prior application for a temporary restraining order in this matter on June 15, 2011. [Docket Items 22 & 23.]  The parties have conducted expedited discovery, taken several depositions, and briefed the issue thoroughly.  The Court again heard oral argument on the motion at a hearing pursuant to Rule 65(a), Fed. R. Civ. P. on August 3, 2011, and subsequently accepted supplemental briefing by the parties, as well as a further telephonic hearing on August 17, 2011.  After considering the factual material presented by the parties and the arguments made in support of their positions, the Court concludes that entry of preliminary relief is not warranted at this time because Plaintiff has not demonstrated a likelihood of success on the merits of its claims, nor of irreparable harm.

The following are the Court's findings pursuant to Rule 52(a)(2), Fed. R. Civ. P.

## II.   BACKGROUND

This matter arises within the heavily regulated area of employee pension plans, which, since at least 1974, has been the subject of comprehensive federal legislation in the form of the Employee Retirement Income Security Act (ERISA) and its subsequent amendment, the MPPAA.  These statutes established an "intricate" dispute resolution scheme and provided only limited avenues for judicial intervention and review.  I.A.M. Nat'l Pension Fund, Plan A, A Benefits v. Clinton Engines Corp., 825 F.2d 415, 416 (D.C. Cir. 1987).  See generally Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia, 830 F.2d 1241, 1243-44 (3d Cir. 1987) (describing background and purposes of ERISA and MPPAA).  The Court is, consequently, mindful of the preferences expressed by Congress in this area when confronted with a party seeking preliminary relief from the statutory dispute resolution structure created by Congress.

Plaintiff EUSA-Allied began contributing to Defendant Teamsters Pension Trust Fund in February of 2006, after signing an agreement with Defendant Fund that recognized a "free look" period under the Pension Trust Fund Plan (hereafter the "Plan").[1] During this free look period, Plaintiff would be free to cease

---

[1] The factual background of this case was previously recounted by the Court in its June 16, 2011 TRO Opinion.  See EUSA-Allied Acquisition Corp. v. Teamsters Pension Trust Fund of Philadelphia & Vicinity, Civ. No. 11-3181, 2011 WL 2457695 (D.N.J. June 15, 2011).  The Court incorporates the factual background in that prior Opinion herein.

contributing to the Fund without incurring any withdrawal liability under the MPPAA, a specific provision of ERISA governing multi-employer pension plans such as Defendant Teamsters Pension Trust Fund.  Specifically, the Agreement states that EUSA-Allied would face "no potential for withdrawal liability" to the Fund under the MPPAA so long as it contributed to the Fund "for no more than five consecutive plan years." Anelli Cert Ex. G. at ¶ 2. Plaintiff claims to have understood that agreement (and the language of the Trust Fund Pension Plan on which it was based and which it references) to guarantee that Plaintiff could withdraw from the Fund up to five calendar years, as much as 60 months, after its initial contributions in February of 2006.

Instead, when Plaintiff withdrew on December 31, 2010 (approximately four years and eleven months after beginning contributions), Defendant Trust Fund concluded that Plaintiff's free look period had expired several months earlier and assessed withdrawal liability of approximately $680,000.  Plaintiff alleges that Defendants fraudulently misrepresented the period of time in which Plaintiff could withdraw under the Agreement and Pension Plan, and did so with the intent of inducing Plaintiff to enter into a collective bargaining agreement with Defendant Teamsters Union Local 312 and to begin making contributions to the Pension Trust Fund.

The Court denied Plaintiff's application for a temporary restraining order in June for three reasons.  First, Plaintiff had not made a showing of a likelihood of success on the merits of its fraudulent inducement claim.  EUSA-Allied Acquisition Corp. v. Teamsters Pension Trust Fund of Philadelphia & Vicinity, Civ. No. 11-3181, 2011 WL 2457695 at *3-4 (D.N.J. June 15, 2011).  Second, the Court found that it lacked the authority to stay interim withdrawal payments under the MPPAA, as the Third Circuit has recognized no discretion or equitable exception to enter a stay.  Id. at *5-6.  Third, the Court found that Plaintiff's showing of irreparable harm was not sufficiently immediate to warrant temporary restraints, because the accelerated payment schedule of default would not be triggered until, at the earliest, August 17, 2011.[2]   Id. at *7.

In Plaintiff's new application for a preliminary injunction, Plaintiff renews its request to stay the MPPAA statutory arbitration procedure and the payment of interim withdrawal liability payments, and also asks the Court to take jurisdiction of the dispute and schedule briefing for summary judgment motions on the question of whether the Fund's assessment of withdrawal

---

[2] Subsequently, the prospect of immediate and irreparable harm to Plaintiff from the acceleration of its alleged $680,000 withdrawal liability became more remote.  On August 17, 2011, counsel for the Fund informed Plaintiff and the Court that the Fund cannot require accelerated payment while a demand for MPPAA arbitration is pending, and that Plaintiff must instead make quarterly interim payments of $54,000, the first of which has been paid and the second of which is due in September.

liability is proper under the Free Look Agreement and the statute.  Plaintiff argues that it has shown a likelihood of success on the question of assessing withdrawal liability under the Free Look Agreement, and a likelihood of success on the fraudulent inducement claim as well, in addition to showing the requisite immediate and irreparable harm it will suffer if not granted the injunction.

Defendants both point out that this Court has already held that it lacks the authority to stay the interim withdrawal payments.  Additionally, Defendants state that the evidence put forward by Plaintiff does not amount to a showing of likely success on the fraudulent inducement claim.  As explained below, the Court will deny Plaintiff's application for preliminary injunctive relief.


## III. DISCUSSION

### A.  Standard of Review

In order to obtain a preliminary injunction, the moving party must establish that "(1) it has a likelihood of success on the merits, (2) it will suffer irreparable harm if the injunction is denied, (3) granting preliminary relief will not result in even greater harm to the nonmoving party, and (4) the public interest favors such relief."  Rogers v. Corbett, 468 F.3d 188, 192 (3d Cir. 2006) (internal quotations and citations omitted).  "All four factors should favor preliminary relief before the

injunction will issue." S & R Corp. v. Jiffy Lube Intern., Inc., 968 F.2d 371, 375 (3d Cir. 1992). As the Court of Appeals has recognized:

> The grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances. This proposition is particularly apt in motions for preliminary injunctions, when the motion comes before the facts are developed to a full extent through the normal course of discovery.

American Tel. and Tel. Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir. 1994) (internal quotations and citations omitted). In the present action, to be granted the preliminary injunction Plaintiff seeks, it must demonstrate likelihood of success on the merits of both its claim that the Court has authority to enter a stay of MPPAA interim withdrawal payments and that the Court can take jurisdiction of the case despite the MPPAA's normal arbitration regime.

**B.   Evidence Produced in Discovery**

The parties have engaged in discovery that has produced more information on, inter alia, how the Pension Fund has applied the free look provisions of the plan in the past, how the Free Look Agreement in this case was drafted, and what Plaintiff had been told about when liability would be assessed prior to the agreement to becoming a participating employer under the MPPAA in February of 2006.

Plaintiff engaged in this discovery, after the Court's denial of its motion for a temporary restraining order, in an

7

effort to uncover evidence in support of its claim of fraudulent inducement.  Plaintiff's position remains that Defendants misrepresented the length of time Plaintiff would be free to withdraw without liability with the intent of inducing it to become a contributing employer and enter into a collective bargaining agreement with Defendant Local Union 312.

       1.   <u>December 2005 Meeting with Union 312 Officers</u>

During the period of negotiation between EUSA and Allied Propane (the company EUSA acquired in 2006), the issue of the potential for withdrawal liability arose.  Allied Propane (the "seller") had, apparently, previously been a contributing employer long enough that it would be obligated to pay withdrawal liability if it were to cease contributions to the fund.  Thus, at the time of the acquisition, the parties and the seller agreed that the seller would have to pay its own withdrawal liability prior to EUSA's acquisition, and that EUSA would join as a new contributor under the plan.  Cleaves Dep. at 32:17-20.

In December of 2005, Mark Cleaves, the CEO of EUSA and Russell Lewis, the vice president of operations for EUSA, met with representatives of the seller and representatives of Teamsters Local 312, including Ted Uniatowski, who was then business agent and president for Local 312.  Cleaves Dep. at 55:15-56:4.  At that meeting, EUSA expressed their concerns about incurring withdrawal liability if they were to enter into a collective bargaining agreement with Local 312 that obligated

8

them to contribute to the Pension Fund at all.  Lewis Dep. at
54:1-18.  Cleaves remembered one of the two union representatives
at that meeting reassuring him that under the free look provision
of the Pension Plan, EUSA would have five years to contribute to
the plan without having to pay any withdrawal liability.  Cleaves
Dep. at 78:8-13.  Cleaves understood this reassurance to mean
that EUSA could withdraw from the plan up to 60 months after
beginning contributions without any withdrawal, and claims to
have relied on that assurance by the union representative in
deciding to enter into the collective bargaining agreement at
that time.  Id.  He explained that he believed that the
representations on this point were representative of the
understanding held by the Fund as well.  Id. at 78:23-79:1 ("we
didn't communicate directly with the Fund.  The Union said that
they are in constant communication with the Fund").

Ted Uniatowski has no independent recollection of that
meeting, but testified that his general understanding of the
Pension Plan's free look provision is that a contributing
employer is free to withdraw up to five full years after
contributing to the Plan without incurring any withdrawal
penalties or liability.  Uniatowski Dep. at 19:3-24.  He also
testified, however, that he had no authority to alter the terms
of the Plan.  Id. at 19:17-19.  Additionally, the Defendants
point out that the Pension Plan itself has a disclaimer addressed

to employee participants immediately following the table of
contents in the Plan that states:

> To All Participants: The only person
> authorized to advise you of your rights under
> this Pension Plan is William Einhorn, the
> administrator, or his designee. If you rely
> upon the advice of anyone other than these
> individuals, you do so at your own risk.

Pension Trust Fund Plan at (i), attached as Ex. H to Plaintiff's
Brief in Support of Preliminary Injunction.

### 2.   William Einhorn and the Free Look Agreement

The Pension Fund's Administrator is William Einhorn, who has
been in that position for more than a decade.  He was
Administrator when the Pension Fund, in 1999, amended the Plan's
free look provision to change the language of the provision from
a six-year free look provision to a five-year provision.  Einhorn
Dep. at 32:3-12.  He testified that the Plan changed the time
period to track recent changes in the MPPAA, which required that
the maximum employee vesting period be shortened from a ten-year
period to a five-year period.  Id. at 32:15-17.  He further
testified that his understanding in 1999, which has remained
constant since, is that the free look provision, like the rest of
the Plan document, is intended only as a succinct statement of
the obligations imposed by the MPPAA itself, and that when
interpreting the Plan, he relies primarily on the statutory
language.  Id. at 63:1-8.  He said he understood the language of
the five-year free look provision to be a fair representation of
the MPPAA statutory language regarding free looks, which is

codified at 29 U.S.C. § 1390.  Id. at 72:5-75:14. When confronted

with any discrepancies between the Plan document and the statute,

however, he stated that he believes that the statute controls,

citing to Article V Section M of the Plan, which states that

> It is the intent of the trustees to have the
> terms and provisions of the pension plan
> conform in all respects with the provisions of
> the Employee Retirement Income Security Act of
> 1974, as amended, 29 U.S.C., Section 1001 et
> seq., the regulations promulgated thereunder,
> and other applicable provisions of federal
> law. In the event that any provision of the
> pension plan as set forth herein does not
> comply with these laws, that provision is
> hereby amended to bring it into compliance.

Einhorn Dep. at 74:15-75:3.  In addition, the Free Look provision

of the Plan also cross references the specific section of the

MPPAA that governs the free look provision, ERISA § 4210,

codified at 29 U.S.C. § 1390.

Einhorn testified that at all times relevant, his

understanding of the meaning of the Plan's free look provision

and the Free Look Agreement both conveyed the meaning that the

free look period ended prior to the time when an employee could

vest in the Fund, even if that resulted in the free look period

expiring in less than five years.  Einhorn Dep. at 100:20-101:5.

When presented with the argument that the language of the free

look provision of the Plan, and the Free Look Agreement that he

signed, can be interpreted to mean that contributing employers

had, at a minimum, five years in which to withdraw from the Plan

without incurring any withdrawal liability, he stated that, to

the extent that the language in the Free Look Agreement and Plan could be interpreted that way, they had to be interpreted alongside § 1390, which states that the free look extends only to "the number of years required for vesting under the plan."  Id. at 98:15-24.  Einhorn stated that his only concern in signing the Free Look Agreement was that the Agreement reference the Plan itself and that the language of the Agreement track the language of the Plan document.  Id. at 53:15-21.  Thus, when asked why he did not seek to amend the Plan's free look provision to make it track the statutory language more closely, he stated that he did not "believe it was necessary" because the Plan already incorporated the statute.  Id. at 102:8-23.

Einhorn testified that EUSA is the first contributing employer he has encountered as Administrator to the Plan that has claimed the right to a free-look withdrawal in the fifth year of contributions.  Id. at 38:2-12.  Other plans that have withdrawn within the free-look period did so before entering the fifth year.  For example, in 2009, a different employer, Twin Oaks of Pennsylvania LLC, withdrew from the Fund after nearly four years of contributions (August 2005 to April 2009) without incurring withdrawal liability because, according to Einhorn, it was still covered by the free look provision of the Plan and statute.  Id. at 21:3-25:13.

3.   <u>Drafting and Signing the Free Look Agreement</u>

Einhorn testified that the Free Look Agreement was drafted
by EUSA's attorney, Jeffrey Van Doren.  <u>Id.</u> at 51:20-52:2.  He
testified that Van Doren never inquired into Einhorn's
interpretation of the free look provision of the Plan, and that
he did not volunteer it because he did not know it was necessary;
he felt that he was negotiating with a sophisticated party
adequately represented by counsel.  <u>Id.</u> at 103:16-20.  Van Doren
presented the Free Look Agreement to Einhorn and asked Einhorn to
confirm certain details of the agreement, such as to confirm that
none of EUSA's subsidiaries had ever been contributors to the
Fund before.  <u>Id.</u> at 52:12-15.  Einhorn testified that he
believed that EUSA wanted the (to his mind) superflous agreement
merely as an extra precaution ("belt and suspenders").  <u>Id.</u> at
52:5-6.  The Court interprets this testimony to mean that Einhorn
did not believe the Agreement was an attempt to change the
substantive terms of the Plan or to contract around the
withdrawal liability obligations of MPPAA.

Einhorn also testified that three months after the deal
closed and the Free Look Agreement was originally signed in
February of 2006, Van Doren contacted Einhorn again asking him to
sign a new version of the Free Look Agreement because Van Doren
had discovered that the original version of the agreement
referred to the wrong portion of the Plan.  After proofreading
the revised version (and offering a minor correction to ensure it

13

tracked the language of the Plan, by noting that Van Doren had omitted the word "more" in the agreement text), Einhorn again signed the revised agreement in May of 2006.  Einhorn Decl. Ex. 1, 2006 e-mail chain.

    4.  Collective Bargaining Agreement

Additionally, discovery also revealed that EUSA's original Collective Bargaining Agreement with Local Union 312, signed in early 2006, obligated EUSA to contribute to the Fund for only two years.  Lewis Dep. at 56:18-23.  In early 2008, the CBA was renegotiated again and extended for another three years (extending until December 31, 2010), without any discussions that any party can recall governing the Free Look Agreement.  Id. at 57:10-13.

**C.**  **Analysis**

    1.  Likelihood of Success of Fraudulent Inducement Claim

Plaintiff is requesting that the Court take jurisdiction of the dispute rather than require the parties to exhaust the normal MPPAA statutory arbitration prior to exercising judicial review.[3] The Third Circuit has recognized only limited claims that would

---

[3] 29 U.S.C. § 1401(a) governs the resolution of disputes under the MPPAA: "(1) Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration."  Plaintiff appears to dispute the Plan Administrator's determination of withdrawal liability under §§ 1381 and 1390 under the MPPAA.  Such a dispute is thus subject to MPPAA arbitration unless, as Plaintiff claims here, the Fund fraudulently induced the employer to enter into the Plan.

permit the Court to set aside the arbitration provision of the MPPAA and take jurisdiction initially.  In Carl Colteryahn, the Third Circuit stated that fraudulent inducement was one such claim that permitted a district court to hear the dispute prior to arbitration.  Carl Colteryahn Dairy, Inc. v. Western Pennsylvania Teamsters & Employers Pension Fund, 847 F.2d 113, 115 (3d Cir. 1988).  However, as discussed in greater detail below, the Third Circuit has elsewhere stated that general contract or statutory disputes are not necessarily entitled to circumvent the statutory arbitration process of 29 U.S.C. § 1401(a).  Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia & Vicinity, 830 F.2d 1241, 1255 (3d Cir. 1987).  Thus, to prevail in its preliminary injunction, EUSA must demonstrate a likelihood of success of its fraudulent inducement claim.

In the Court's June 15, 2011 Opinion denying Plaintiff's request for a TRO, it held that to demonstrate a likelihood of success on the merits of a fraudulent inducement claim, Plaintiff would have to demonstrate an ability to prove

> (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as the proximate result.

Carl Colteryahn Dairy, Inc. v. Western Pennsylvania Teamsters &
Employers Pension Fund, 1993 WL 120457 at * 2 (W.D. Pa. Feb. 9,
1993).

Plaintiff has not satisfied this burden here.  Plaintiff
argues that courts in this District have recognized that, in
addition to affirmative misrepresentations, fraudulent inducement
can be demonstrated when "defendants knowingly omitted material
facts in the execution of the [relevant contract]."  The Mall at
IV Group Properties, LLC v. Roberts, Civ. No. 02-4692, 2005 WL
3338369 at *8 (D.N.J. Dec. 8, 2005).  Thus, Plaintiff argues,
fraudulent inducement can be demonstrated in this case through
(1) the Union representatives' statements regarding their
understanding of the free look provision of the Plan in December
of 2005; (2) the affirmative "misrepresentation" of the free look
provision of the Plan which states that there was no possibility
for liability prior to five years after Plaintiff's signing the
Free Look Agreement, and also (3) through Einhorn's "knowing
omission" of his contrary interpretation of the free look
provision that the free look period ends at the time that an
employee has vested in the Fund and his "knowing omission" of his
intent to impose liability prior to the full five years.

The Court concludes that Plaintiff has failed to demonstrate
a likelihood of success on its fraudulent inducement claim.  The
Court finds that the statements of the Union representatives in
2005 were not misrepresentations by the Fund, as the statements

16

of the Local Union representatives are not attributable to the
Fund.  See Pension Plan Disclaimer at (i); Schneider Moving &
Storage Co. v. Robbins, 466 U.S. 364, 372-74 (1984) (holding that
multiemployer plans are not bound by arbitration provisions
negotiated between unions and employers).  Thus, the statements
cannot be deemed a fraudulent inducement by Defendant Trust Fund
because they are not attributable to the Fund, and they cannot be
fraudulent inducement by Defendant Local Union 312 because there
is no evidence of intent to mislead or justifiable reliance by
Plaintiff in the statement.

Secondly, the Court finds that the free look provision of
the Plan, which was drafted years prior to EUSA's negotiations in
2006, is not a fraudulent misrepresentation for several reasons.
First, there is no evidence that the trustees believed that the
Plan language was a misstatement of the employer's rights with
regard to the period in which an employer could withdraw.
Second, there is no evidence that they intended the Plaintiff to
take any act on the basis of the statement.  Third, there would
be no justifiable reliance on the part of EUSA on the specific
wording of the Plan alone, as it explicitly references the more
restrictive language of the statute, which is therefore
incorporated into the Plan.  Indeed, even if Plaintiff were to
prevail on its argument that the Plan's "five year" language
explicitly conflicted with the shorter period of vesting language
included in § 1390, there would still be no justifiable reliance

17

on the part of EUSA in relying on the Plan over the Statute, as
the parties could not have modified the withdrawal liability
under the MPPAA by private agreement, even if the Plan were to
explicitly state that it did so.  See Concrete Pipe & Products of
California, Inc. v. Construction Laborers Pension Trust for
Southern California, 508 U.S. 602, 641-42 (1993) (enforcing the
MPPAA's assessment and arbitration provisions even though
employer attempted to limit liability through private
agreements); Connolly v. Pension Benefit Guaranty Corp., 475 U.S.
211, 225-24 (1986) ("Contracts, however express, cannot fetter
the constitutional authority of Congress . . . . Parties cannot
remove their transactions from the reach of dominant
constitutional power by making contracts about them.").

The same analysis applies to the alleged "omission" by
Einhorn in the course of his signing the Free Look Agreement.
Plaintiff argues that Einhorn's intent to impose withdrawal
liability prior to the full five years stated in the Agreement
was a material fact that Einhorn withheld from Plaintiff during
the negotiation of the Free Look Agreement.  The Court rejects
this argument for several reasons.  First, the Court finds no
evidence in the record that Einhorn had made a determination
about the precise point that the free look period would end when
he signed the Agreement in 2006.  Thus, any "omission" of this
interpretation of the plan and the MPPAA could not have been
intentional.  Second, the uncontradicted testimony demonstrates

that, to the extent that Einhorn had an intent in this area, it was only to interpret the statute itself.  The statutory interpretation of one party to a contract negotiation is not a factual representation or omission.  Third, the Court finds that even if Einhorn's failure to offer unsolicited advice on how he would interpret the free look provision of the plan could constitute an "omission" in this case, there is no evidence that he intended to induce any action on the part of EUSA through his "omission."  Fourth, Plaintiff has not shown that it would not have entered into the obligations under the Plan if it had known that the free look period was limited by statute to four years plus 750 hours of eligible employment rather than five years.  Finally, even if Plaintiff could demonstrate an intent by Defendant Fund to induce such action that Plaintiff would not otherwise have taken, any reliance by EUSA on the omission of this interpretation would not be justifiable reliance, as it was represented by counsel and the Plan and Agreement explicitly reference the specific section of the MPPAA at issue.

Therefore, the Court must conclude that Plaintiff has not demonstrated a likelihood of success on the merits of its fraudulent inducement claim and therefore cannot enter a preliminary injunction staying the statutory arbitration procedures set out in the MPPAA.

2.   <u>Authority to Enter Stay of Interim Payments Under
Galgay v. Beaverbrook Coal Co.</u>

Plaintiff requests that the Court take jurisdiction of the
case and stay the payment of interim withdrawal payments, the
first of which, the parties represented to the Court at a
telephone status conference, was paid on August 17, 2011, in an
amount of $54,000.  This Court previously held that, pursuant to
<u>Galgay v. Beaverbrook Coal Company</u>, 105 F.3d 137, 140 (3d Cir.
1997), the Court has no authority under the MPPAA to enter a stay
of interim liability payments.  <u>See</u> <u>EUSA-Allied</u>, 2011 WL 2457695
at *4-7.  The Court incorporates its analysis and conclusions
regarding the staying of interim payments into this Opinion.

In the new briefing, Plaintiff repeats the arguments made in
its application for a temporary restraining order, that Plaintiff
is entitled to a stay of payment under the exception to mandatory
interim withdrawal liability payments recognized in the Fifth and
Seventh Circuits.  <u>See</u> <u>Trustees of Plumbers and Pipefitters
National Pension Fund v. Mar-Len, Inc.</u>, 30 F.3d 621, 626 (5th
Cir.1994); <u>Trustees of the Chicago Truck Drivers Pension Fund v.
Rentar Industries, Inc.</u>, 951 F.2d 152, 155 (7th Cir. 1991).

The Plaintiff makes no new arguments regarding why this
exception, never before recognized in this Circuit, should apply
here, despite the Court having rejected it in its Opinion denying
the TRO request.  Judge Linares recently recognized the same
limitations upon the Court's power to stay interim withdrawal
liability payments in <u>Teamsters Local 945 Pension Fund v. Omni</u>

Waste Svcs., Inc., Civ. No. 11-3077, 2011 WL 3329550 at *4
(D.N.J. Aug. 1, 2011) ("absent a contrary directive from the
Court of Appeals for the Third Circuit, the Court declines to
apply an equitable exception to the statutory provisions on
interim payments.").  Plaintiff simply claims that Defendant
Trust Fund's insistence on assessing withdrawal liability in
accordance with the statute, despite the "clear and unambiguous"
language of the Free Look Agreement and Pension Plan document, is
frivolous.

        Thus, the Court sees no reason to reconsider its
determination that the Third Circuit recognizes no equitable
exceptions to the mandatory interim payments under the statute.
Additionally, even were it to apply the Fifth and Seventh
Circuit's exception, the Court has already determined that it
interprets the "frivolous" exception to be limited to cases where
the fund seeks to impose liability in explicit conflict with the
provisions of the MPPAA itself and that Defendant Trust Fund's
arguments for withdrawal liability are not frivolous.  Plaintiff
makes no argument that assessing withdrawal liability in this
situation is in conflict with the terms of the MPPAA or that the
Court's analysis of the issue was incorrect in its June 16, 2011
Opinion.  Thus, the Court again finds that Plaintiff has not
shown a likelihood of success on the issue of whether the Court
can stay the payment of the interim withdrawal liability payments
during the resolution of this case.

3.  Mandatory Arbitration of Withdrawal Liability
    Dispute

Absent Plaintiff's claim of fraudulent inducement, the Court finds that Plaintiff's remaining contract disputes and suit for declaratory injunction must be submitted to the mandatory arbitration process of 29 U.S.C. § 1401.  Plaintiff cites to Dorn's Transportation Inc. v. Teamsters Pension Trust Fund, 787 F.2d 897, 901 (3d Cir. 1986) for the proposition that a dispute that concerns only a question of statutory interpretation is not one properly to be subjected to arbitration.  See also Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia, 830 F.2d 1241, 1253 (3d Cir. 1987).  Thus, in the narrow case where withdrawal liability turns only on the interpretation of a provision of the MPPAA and involves no disputed material facts or factual development, the district court should waive the statutory arbitration requirement.  In Plaintiff's supplemental submission, Plaintiff further argues that the dispute primarily turns on the threshold issue of contractual interpretation rather than statutory interpretation.

Defendants argue that, with regard to the question of whether liability is properly assessed in this case under the free look provision of the Plan and under 29 U.S.C. § 1390, the narrow exception recognized in Dorn's and Flying Tiger does not apply here because there are factual questions necessary to be developed.  For example, Defendant Fund suggests that there is a factual dispute over whether and how many employees of EUSA-

Allied actually did vest in the Fund in the period between February 6, 2006 and December 31, 2010, which (according to their interpretation of the statute) would determine whether or not withdrawal liability is properly assessed.

Plaintiffs counter that they do not contest the possibility that some small number of employees could have vested in that time, but merely dispute the Fund's statutory interpretation of the running of the free look period under 29 U.S.C. § 1390 and the contractual question of whether the Plan and the Free Look Agreement obligated Plaintiff to pay any withdrawal liability at all prior to the expiration of five years.

The Court finds that Plaintiff has not demonstrated a likelihood of success on this issue. Any interpretation of the Free Look Agreement necessarily involves an interpretation of the referenced portions of the Plan and Statute. Thus, there is no threshold issue of contractual interpretation, as Plaintiff argues. Secondly, while the primary dispute between the parties at this point may still be whether withdrawal liability was properly assessed under the statute, this question is intertwined with the factual questions of whether any employees did in fact vest before Plaintiff's withdrawal, and whether the withdrawal liability was accurately computed. As the principal concern of the MPPAA is to protect multiemployer pension plans like Defendant Fund from being saddled with paying unfunded vested benefits to plan participants, see SUPERVALU, Inc. v. Bd. of

23

Trustees of Sw. Pa. & W. Md. Area Teamsters & Employers Pension Fund, 500 F.3d 334, 336 (3d Cir. 2007), the development of facts such as these are relevant to the dispute.

This outcome recognizes the strong policy in favor of statutory arbitration expressed in the statute and recognized in caselaw in this Circuit.  See Flying Tiger, 830 F.2d at 1255 ("Distinctions between questions of fact and law are, after all, often rather tenuous, and MPPAA's language and purposes convince us that any doubt concerning fact/law differentiation as a means of determining whether arbitration is appropriate should be resolved in favor of arbitration").  Consequently, the Court will not enter a preliminary injunction staying the mandatory arbitration procedure under 29 U.S.C. 1401 if Plaintiff contests the withdrawal liability assessed by the Fund.

    4.  Irreparable harm

Plaintiff has argued that it faces the possibility, supported by its financial records, that the imposition of interim withdrawal payment schedule set forth by the Fund could potentially cause Plaintiff to fail as a business.  However, in a telephone status conference in this matter on August 17, 2011, Plaintiff's counsel reported to the Court that Plaintiff had paid the initial interim liability payment earlier that day, and yet Plaintiff has not yet gone out of business.  Thus, the Court concludes that the harm potentially faced by Plaintiff through

the payment of interim liability payments is not, at this time, irreparable.

Further, counsel for the Fund conceded in the course of the August 17 status conference, that the Fund cannot accelerate the withdrawal penalty once MPPAA arbitration has been sought, as in this case.  Accordingly, Plaintiff faces the prospect of making only quarterly interim payments of $54,000, rather than an accelerated lump sum penalty of $680,000, while the arbitration is ongoing.  Plaintiff appears to have the financial ability to meet this interim obligation without grave risk of harm.

Despite this conclusion, the possibility of Plaintiff's business failing, even if remote, would be detrimental to all parties concerned, including Local 312's members who would lose their jobs if Plaintiff were to go out of business.  This is certainly not a consequence taken lightly by the Court. Notwithstanding the Court's concern for and sympathy with Plaintiff's situation, however, the Plaintiff's apparent ability to make its initial interim withdrawal payment raises doubts about the immediacy of the harm and whether any such harm would truly be irreparable.

The Court concludes that Plaintiff has not demonstrated the likelihood of irreparable harm if this injunction is denied.

## IV.   CONCLUSION

Because Plaintiff has not demonstrated a likelihood of success on the merits of its fraudulent inducement claim, and has not provided the Court with any new basis to stay the mandatory interim withdrawal liability payments, and because Plaintiff has not demonstrated the likelihood of irreparable harm, the Court must deny Plaintiff's application for a preliminary injunction. The accompanying Order shall be entered.


**August 18, 2011**                            **s/ Jerome B. Simandle**
Date                                           JEROME B. SIMANDLE
                                               U.S. District Judge